IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 16, 2003 Session

## CARL A. LINDBLAD, M.D., v. PARKRIDGE HEALTH SYSTEM, INC., ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 99C2383     W. Neil Thomas, III, Judge**

---

**No. E2003-00221-COA-R3-CV**

---

The Plaintiff resigned his position as Director of the hospital's emergency services. Parkridge Health System, Inc. d/b/a East Ridge Hospital, [hereafter "the hospital" or "Defendant"] accepted his resignation and terminated his staff privileges in accordance with an employment Agreement. The hospital's bylaws required notice and hearing, which were not followed. The Plaintiff filed this action asserting that in failing to observe its bylaws the hospital breached its contract with him since the bylaws were an integral part of the contract. The Chancellor granted the hospital's motion for summary judgment, holding that the Agreement, which provided for termination of staff privileges controlled the issue. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM H. INMAN, SR. J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and CHARLES D. SUSANO, JR., JJ, joined.

Larry L. Crain, Brentwood, Tennessee, attorney for appellant, Carl A. Lindblad.

Sue E. Scruggs and C. Eugene Shiles, Chattanooga, Tennessee, attorneys for appellee, Parkridge Health Systems, Inc. d/b/a East Ridge Hospital.

### OPINION

At relevant times the Plaintiff was a licensed physician, and the Director of the Defendant hospital's emergency room. He was the sole shareholder of a corporation styled Associates in Emergency Medicine [hereafter "Associates"], chartered in 1995. His practice was limited to providing emergency medical treatment at the hospital; he had no private patients, and he neither sought nor obtained admitting or attending privileges at the hospital.

In July 1999, he ordered, apparently *sub rosa*, a quantity of narcotic drugs from Henry Schein, Inc., a distributor of medical supplies and medications, which were delivered to him, by

parcel post, at the hospital.[1] The package was discovered by hospital personnel who opened it, and examined the contents which were later delivered to the Plaintiff.

Narcotic drugs are closely regulated by state and federal law, as well as by hospital policy which prohibits the acquisition or dispensing of drugs except in strict compliance with the applicable laws, regulations, and policies of the hospital.

For the purpose of ascertaining from the plaintiff the purpose and intended use of these drugs a meeting was held, on August 13, 1999, with members of the hospital's Pharmacy and Therapeutics Committee in attendance. Present were Brenda Waltz, (CEO of the hospital); Dr. America Jones, (Director of Pharmacy); Dr. Donald Hartsfield, who was the Chair of the Committee, and the Plaintiff. The Plaintiff was informed that an explanation of the matter was necessary because, *inter alia*, the quantity of the drugs delivered to him exceeded the amount of the same drugs in the pharmacy's inventory, and his acquisition of these drugs was violative of hospital policy.

The Plaintiff stated that he bought the drugs "to keep around the house for family, friends", as well as neighbors. Dr. Hartsfield testified that Dr. Lindblad said that he had obtained the drugs to do his friends a favor. It developed that Dr. Lindblad had previously purchased drugs from the same source. He admitted in his deposition that he did not establish a doctor-patient relationship with family, friends or neighbors prior to dispensing drugs/medications and did not maintain any documentation of his dispensation of drugs. According to Dr. Hartsfield, when the Plaintiff was informed by the Director of Pharmacy that he could not take delivery of controlled substances at the hospital, he became defensive and stated that "as a physician he could do what he wanted to with the drugs." Dr. Jones described Plaintiff's response as "belligerent, very angry, defensive and [he] threatened me." Dr. Hartsfield testified that "[h]e didn't give us a clear sense that he was not going to cease getting controlled substances." Dr. Jones was concerned because, as she testified, ". . . Joint Commission for Accreditation of Hospitals makes me solely responsible for every medication that flows through the hospital", including samples brought by doctors from their offices.

The Plaintiff's response and the hospital's concern about the large quantity of drugs ordered by the Plaintiff and delivered to the hospital resulted in Ms. Waltz informing the Plaintiff that he should find other physicians to take his shifts until the drug situation was clarified, but Associates continued to provide exclusive services to the hospital's emergency department. The Plaintiff did not protest arrangements and agreed that he would not work. Apparently, this temporary arrangement did not constitute disciplinary action under the bylaws but was taken pursuant to and consistent with ¶ 1.4 of the Professional Services Agreement ["Agreement"], hereafter discussed.

On the same day of the Committee meeting, Ms. Waltz contacted Dr. Gary Olbrich, the Medical Director of the Medical Foundation Physicians Health Program, more commonly known as the "Tennessee Impaired Physician's Program", who agreed to confer with the Plaintiff, and did

---

[1] The drugs included 500 Xanax 200 mg. tablets, a Schedule IV drug, 500 hydrocodone ASAP tablets, a Schedule II drug, one pint of hydrocodone syrup, and one pint of hydrocodone with homatropine syrup.

so, six days later. The initial assessment by Dr. Olbrich included a psychosocial evaluation, as well as an addiction medicine evaluation, but with no actual drug screening. Dr. Olbrich testified that he found the Plaintiff to be forthcoming and not an immediate risk to return to work; he testified that he routinely asks hospitals to give physicians within the program "a medical leave of absence pending review of the circumstances." To form a reasoned opinion about the Plaintiff's conduct and perhaps facilitate his return to the hospital, Dr. Olbrich had the following discussion with the Plaintiff:

> Q.    What did you tell Dr. Lindblad as far as your understanding to get back to the hospital administration?
>
> A.    I asked him - well, we discussed several options. As I told him, that based on the information that I had been able to obtain from him, I saw no particular reason to tell that we had any collating [sic] information to indicate that he might be a substance abuser or have a chemical dependency. There was, however, the allegation that he had received a large amount of mood-altering drugs, for what purpose, we don't know and that it would be in his best interest to help resolve the difficulty and preserve his reputation if we could establish that beyond just my word and our interview that there was no evidence of chemical dependency. I don't know – I honestly don't remember specifically what I discussed with Dr. Lindblad, but the options usually are to ask them – they – someone like this who has a low level of suspicion, I would offer them the opportunity to do random urine drug screens over a period of time, usually a year, to determine – and almost without question if someone is chemically-dependent, we will catch them with the use of – an inappropriate use of a mood-altering drug during that time. An extreme form would be – you know, the ultimate form actually is to go into a 3-5 day residential evaluation where you have a team of assessors. And I'm certain based on the information I received that I did not say he needed that unless he might need that to satisfy people who were concerned about him.

Questions hovered nevertheless, not only about whether Dr. Lindblad might be a drug abuser, but whether he might have improperly distributed drugs to others. In an earlier telephone conversation secretly recorded by the Plaintiff between Dr. Olbrich and himself, Dr Olbrich appeared to be alarmed about the Plaintiff's activities:

> Plaintiff:    First off, I wanted to let you know that I don't have a "problem". I don't take drugs, I don't use alcohol,

although I did have a toasted almond in the Bahamas three weeks ago. People may consider that . . .

Dr. Olbrich:     Tell me why so many – such large amounts of drugs were ordered.

Plaintiff:       Well, you know, I ordered them because they were cheaper to order them that way, that's the only reason.

Dr. Olbrich:     You ordered them for the Emergency Room:

Plaintiff:       No, no, I just keep them around the use for my neighbors, friends, things like that.

Dr. Olbrich:     Well, I've got a problem with that, too, but we'll talk about that later.

Plaintiff:       Yeah, okay. Yeah, okay. What – what I didn't understand was that the hospital had turned me in for – for what? I mean, is it just the drugs or what?

Dr. Olbrich:     Well, apparently, they were concerned about you.

Plaintiff:       Uh huh.

Dr. Orbrich:     Well, it's a long, complicated story.

Plaintiff:       Right.

Dr. Orbrich:     It's not okay to be prescribing for friends, neighbors, family and whatever.

Plaintiff:       Uh huh.

Dr. Orbrich:     That's simply not okay.

Plaintiff:       Right.

Dr. Orbrich:     Particularly in this state. And that's the antibiotics or anything – certainly scheduled drugs.

Plaintiff:       Right.

Dr. Orbrich:   And they were just real concerned about what was going on.

Plaintiff:   Right.

Dr. Orbrich:   It looked like drug trafficking, it could look like there was an addiction with you or some member of your team.

Plaintiff:   Right

Dr. Orbrich:   They just felt a real – and I would confirm – responsibility to investigate it.

Plaintiff:   Well, I'm the one who went to the DEA. I don't know if they called or not, but I went to the DEA, myself.

Dr. Orbrich:   Okay.

Plaintiff:   Because I wanted to know if there was some kind of legal problem - you know, am I breaking some kind of law or something? I mean, if I was . . . .

Dr. Orbrich:   If the Court of Medical Examiners found out you were ordering these and giving them to non-patients, your license would be in real jeopardy.

Plaintiff:   Right, well, I even told them that I would flush them down the toilet for all I care. I mean, it's not that important for me. I don't need them. I just keep them around for the convenience of myself and other people. And actually, I guess the reason I even order any of that stuff, even the antibiotics and every thing else that went with it, of course, was that nobody details anything anymore. It used to be everybody kept all this stuff around all the time, and now they don't even . . .

Dr. Orbrich:   . . . . in all fairness, Doctor, not in large quantities like that.

Plaintiff:   Uh huh.

Dr. Orbrich:    You know, they might take some samples home from work, or they might have a prescription for Hydrocodone or might have a little bit of cough syrup, but you know, you've got enough there to get a lot of people pretty high.

Plaintiff:    Well, you know, in retrospect, it was a lot, but it was cheaper to buy them that way, so I got them that way, you know, but . . . .

Dr. Orbrich:    That's showing me a lot of naivete.

The day after Dr. Olbrich met with Dr. Lindblad and discussed the hospital's legitimate concerns and how they might be alleviated, including the use of drug testing, the Plaintiff, on behalf of his corporation voluntarily terminated the Agreement, including the Exclusive Provider Agreement, for emergency services with the hospital. The effective termination date was August 24, 1999. Thereafter the Plaintiff secreted the drugs and then flushed them down the toilet. In describing these actions, Dr. Lindblad in his deposition stated:

A:    Yeah. So I took them home. And, to be perfectly honest with you – I don't want to be negative, too negative, about this; but, to be perfectly honest with you, I didn't know what HCA would do, so I hid them. I hid them for about four months. Then I wasn't going to use them, so I threw them away.

Q:    Threw them away. Where?

A:    In the toilet.

In response to Plaintiff's cancellation of the Agreements the hospital sent Plaintiff a letter accepting the termination of the Agreement and, citing the Exclusive Provider Agreement, (Addendum 1) advising him that his medical staff privileges were terminated. The Exclusive Provider Agreement provided for the termination of staff membership and privileges of any of Associates' representative after the Agreement had been terminated *for any reason.*

The Plaintiff had no further contact with the hospital after he terminated the Agreement. He did not indicate that he considered the termination of his privileges or any other action/position of the hospital as adverse or disciplinary, and did not request a hearing under the bylaws.

This action was filed December 27, 1999 as amended on March 25, 2002 to join Associates in Emergency Medicine as a party Plaintiff, alleging that the Defendant (1) wrongfully revoked his hospital privileges, (2) deliberately interfered with his livelihood, (3) defrauded him, and (4)

breached his contract. He alleged that through his physician group (AEM), he entered into a Professional Services Agreement to render professional emergency services at the hospital, effective July 1, 1994, for a period of five years, and that he resigned August 24, 1999.

He further alleged that he did not forfeit or surrender his clinical privileges as a staff physician at the hospital, because under the bylaws clinical privileges cannot be terminated without due process, i.e., notice and hearing, which was not accorded him. He alleged that the Defendant Waltz sent him a letter terminating his staff membership and clinical privileges effective August 24, 1999.

He alleged that on August 13, 1999 he was summoned to the office of CEO Baltz who, with others, confronted him about a package addressed to him which "contained an order of common medications of the type routinely ordered by physicians." He was informed by Ms. Baltz that he could no longer work at the hospital pending an investigation, and that at no time was he afforded a hearing as required by the bylaws. He learned from Dr. Olbrich that the Defendants accused him of suspected drug abuse, drug trafficking, and using the hospital's DEA number to order drugs.

The Defendants filed an answer alleging that the Plaintiff resigned his position as of August 24, 1999 following which his medical staff privileges were terminated as contractually provided. The answer was amended to assert that Ms. Waltz was immune from liability pursuant to a specific provision of the hospital bylaws. Further, the hospital alleged that if its conduct was "adverse", within the meaning of its bylaws, the actions barred because the Plaintiff failed to exhaust his administrative remedies afforded by the bylaws.

On March 5, 2002 the Defendants filed a joint motion for summary judgment alleging the absence of any genuine issues of material fact and that the Defendants were entitled to judgment as a matter of law.

The trial judge filed a memorandum opinion, which, as excerpted, found:

> The plaintiff is a licensed practicing medical doctor who was the physician director of the emergency room of East Ridge Hospital ("East Ridge"). He limited his practice to providing emergency medicine at East Ridge and had no private practice or patients of his own. His privileges were limited to the practice of emergency medicine. The plaintiff was the sole owner of Associates in Emergency Medicine ("Associates"), a corporation which in 1995 contracted with the hospital to be the exclusive provider of emergency room services at East Ridge. East Ridge and Associates entered into a Professional Services Agreement to provide emergency medicine on March 24, 1995, and an Addendum on January 10, 1996 (hereinafter both of which are referred to as the "Agreement"). The

term of the Agreement was from July 1, 1994, to June 30, 1999, and was not renewed. Section 3.2 of the Agreement provides as follows: Either party may terminate this Agreement, without cause, by providing no less than 60 (sixty) days' prior written notice stating the intended day of termination, which shall occur not sooner than the first annual anniversary of Effective Date.

The Addendum to the Agreement provides in [S]ection 6 as follows:

> Upon the termination of this Agreement for any reason, Facility may terminate or otherwise qualify or limit the medical staff membership and/or clinical privileges of any or all of Contractor's Representatives. Further, upon any severance of the affiliation between Contractor and a Contractor's Representative, Facility may terminate or otherwise qualify or limit the medical staff membership and/or clinical privileges of such Contractor's Representative. The rights of Facility under this Section shall supercede any contrary terms as may be established in the Medical Staff Bylaws. Contractor shall deliver to Facility a written statement form each Contractor's Representative acknowledging and agreeing to these concurrent termination provisions.

In June or July of 1999, the Plaintiff received a package of drugs, which was addressed to the Plaintiff but which utilized the hospital's street address. The drugs purchased by the Plaintiff included controlled substances such as xanax, benzodiazepine, and hydrocodone. The delivery ticket for the package was addressed to Dr. Carl Lindblad, not East Ridge, and at all times it was Dr. Lindblad's property. After the discovery of the drugs a meeting was held among the hospital's chief executive officer, the pharmacy director, and the chairman of the Pharmacy and Therapeutic Committee on August 13, 1999, after which the Plaintiff was placed on leave. During this meeting the Plaintiff responded to all of the questions put to him regarding the drugs and stated that the medications were for his family, friends and neighbors. No records were kept of medications dispensed to family, friends or neighbors in need of such medications. After this meeting Brenda Waltz, the chief executive officer of East Ridge, contacted Dr. Gary Olbhrich [sic] of the medical foundation known as the "Tennessee Impaired Physician's Program," to "clarify" the situation with Plaintiff's use of

drugs. The Plaintiff met with Dr. [Olbrich] on August 19, 1999, and after this meeting Dr. [Olbrich] assured the Plaintiff that there was nothing for him to worry about. Aside from his being naive, Dr. Lindblad was advised that in Dr. [Olbrich's] opinion there was no problem which warranted any further action. Dr. [Olbrich] informed Brenda Waltz of his conclusion on or about August 20, 1999. On August 20, 1999, the Plaintiff submitted a notice of termination, the effective date of which was August 24, 1999. That letter reads as follows:

> This is to inform you that as of 7 a.m. on Tuesday August 24, 1999, Associates in Emergency Medicine, will no longer be providing Emergency Physician Services at East Ridge Hospital.

In response, the Hospital sent the Plaintiff a letter acknowledging the receipt of his letter, and, citing the Agreement, advised the Plaintiff that his medical staff privileges were terminated. That letter reads in part as follows:

> Please be advised that in accordance with the provisions of Section 6 of Addendum 1 of the Agreement, the Hospital has elected to terminate your medical staff membership and clinical privileges effective on the date of termination of the Agreement as set forth above. The medical staff membership and clinical privileges of the other members of the Group will continue unaffected. Please note that it is our position that termination as set forth here is not a reportable action under the Health Care Quality Improvement Act and its interpretive regulations.

The Plaintiff submitted the affidavit of Dr. James H. Creel, the medical director for the emergency department at Erlanger Hospital, in opposition to the motion. In his affidavit Dr. Creel states that the conduct of East Ridge constituted a violation of the medical staff Bylaws in effect at East Ridge in August of 1999. Dr. Creel opines that the due process provision of Article 7 of the Bylaws requires initiation by East Ridge of proceedings to terminate his privileges. This opinion, however, begs the question of whether the Bylaws apply to the situation presented in this lawsuit.

*  *  *  *  *

The Plaintiff argues that the East Ridge Bylaws constitute the contract, since the Agreement expired by its terms on June 30, 1999. Under [S]ection 3 of the East Ridge Hospital Medical Staff Bylaws each practitioner at East Ridge agreed to abide by the bylaws, rules, and regulations and policies as amended and issued from time to time.

The Plaintiff argues that once the formal contract between East Ridge and Associates expired on June 30, 1999, the legal relationship between the Plaintiff and East Ridge was governed wholly under the terms of the East Ridge Bylaws.[2] In his brief, however, Dr. Lindblad cites no case to establish that the relationship between two contracting parties is not governed by the contract where the contract has expired.

Before deciding whether the Agreement applies or the Bylaws apply the Court will discuss a case relied on by both parties. *Lewisburg Community Hospital, Inc. v. Alfredson*, 805 S.W.2d 756 (Tenn. 1991). In *Lewisburg Hospital* the Hospital terminated a doctor's privileges and denied him access. As here, the hospital maintained that its bylaws did not constitute a contract with the doctor and that he was not entitled to a hearing. The doctor argued to the contrary. The Supreme Court held that the bylaws were an integral part of the contract with the doctor. The facts, however, depart from the facts of this case at that point. The doctor's first contract with Lewisburg Hospital expressly stated that either party could cancel on ninety days' notice, and, in the event of termination, the clinical privileges would also terminate. The second contract, however, deleted that provision, thereby kicking in the application of the bylaws. The Supreme Court required the hospital to abide by its bylaws and give the doctor a fair hearing. In rejecting the argument of the hospital the Supreme Court held:

> The Hospital's argument ignores the fact that it made a business decision when it agreed to delete the automatic termination of Alfredson's clinical privileges from the 1984 exclusive radiology contract. Had it not made that business decision, Alfredson would have no claim for breach of contract.

---

[2]In footnote 5 on page 12 of his brief the Plaintiff concedes the if "the Defendants had automatically extended Dr. Lindblad's contract then the bylaws would not have controlled the outcome."

-10-

If, therefore, the Bylaws apply, the Plaintiff prevails. If they did not, then, as Plaintiff concedes, the Defendants prevail.

It now must be determined whether the Agreement applies or the Bylaws apply. In doing so the intention of the parties must be determined. In that regard, the "ascertainment of the intention of the parties to a written contract is a question of law rather than a question of fact." *Doe v. HCA Health Services of Tennessee*, 46 S.W.3d 191 (Tenn. 2001); see also, *Allman v. Boner*, 1993 Tennessee Appeals LEXIS 793 (Ct. App.1993).

The next issue to be considered, therefore, is whether a contract existed between the parties on August 20, 1999, and, if so, its terms. Although the Agreement expired by its terms on June 30, 1999, that does not end the inquiry. If the parties to an expired agreement with a definite term continue to perform as if the agreement were still in effect, it is presumed that they are serving under a new contract with the same terms as the old. *Delzell v. Pope*, 294 S.W.2d 690 (Tenn. 1956). In order to make this determination the conduct of the parties will be examined. On July 7, 1999, the Plaintiff applied for reappointment to East Ridge. Until August 13, 1999, the Plaintiff continued to provide services to East Ridge, and East Ridge accepted those services on an exclusive basis. On August 20, 1999, it is significant that the Plaintiff gave notice to terminate the Agreement between Associates and East Ridge. Finally, Dr. Lindblad has testified that he believed the Agreement to be still in effect. Accordingly, the Bylaws are not applicable to the termination, and the Defendants are entitled to partial summary judgment on this issue.

\* \* \* \* \*

### The Standard of Review

The standard of review on appeal of a grant of summary judgment is *de novo* upon the record without a presumption of correctness to determine whether the absence of genuine and material factual issues entitle the movant to a judgment as a matter law. ***Goodloe v. State***, 36 S.W.3d 62, 65 (Tenn. 2001). The movant must either affirmatively negate an essential element of the non-movant's claim or conclusively establish an affirmative defense; mere conclusory assertions that the non-movant has no evidence are insufficient; and if the movant does not negate a claimed basis for the suit, the non-movant's burden to produce evidence establishing the existence of a genuine issue for trial is not triggered and the motion for summary judgment must fail, If, however, the movant successfully negates a claimed basis for the suit, the non-movant may no longer simply rely upon the pleadings, but must then establish the existence of the essential elements of the claim or the non-

existence of the defense. *Finister v. Humboldt General Hosp., Inc.,* 970 S.W.2d 435, 438 (Tenn. 1998).

In reviewing the record to determine whether summary judgment requirements have been met, this Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. *Byrd v. Hall*, 847 S.W.2d 208, 210-11 (Tenn. 1993). A summary judgment may be proper, therefore, only "when there is no dispute over the evidence establishing the facts that control the application of a rule of law." *Ib*. at 214-15: Tenn. R. Civ. P. 56.

## The Issue

The restated issue is whether summary judgment was properly granted with respect to the Plaintiff's claim for breach of contract arising out of his summary suspension from the medical staff of the Hospital.

## Analysis

The issue is necessarily resolvable either by (1) the bylaws of the Hospital, or (2) the contract between the parties.

The contract, described as a Professional Services Agreement, became effective July 1, 1994 and expired June 30, 1999. It provides that

> Either party may terminate this Agreement, without cause, by providing not less than 60 days prior written notice stating the intended date of termination, which shall occur not sooner than the first a annual anniversary of the effective date.

It further provides that

> Either party may terminate this Agreement at any time in the event the other party engages in an act or omission constituting a material breach of any term or condition of this Agreement . . . . and upon any termination of this Agreement, neither party shall have further right against, or obligations to, the other party, except . . . . this Agreement . . . . supersedes all prior Agreements, contracts and understandings . . . .between the parties.

Addendum One to the Agreement, Section 6, described as the Exclusive Provider Agreement, provides

> Upon the termination of this Agreement for any reason, Facility may terminate . . . the medical staff membership and/or clinical privileges

-12-

of any or all of contractor's representative. . . . the rights of Facility . . . Shall supersede any contrary terms as may be established in the Medical Staff By-laws . . .

The original Bylaws, adopted April 12, 1994 made no provision for a due process hearing, but in April 1999 the Bylaws were amended to provide that:

> Any practitioner whose contractual engagement by the Hospital requires membership on the medical staff shall not have his/her medical staff membership or admitting and clinical privileged terminated without the right to hearing and appeal. . . .

Dr. Olbrich informed Ms. Waltz, the Hospital's CEO, on August 20, 1999 that there was no problem with the Plaintiff which warranted further action. On that same day, the Plaintiff tendered his resignation effective August 24, 1999. He wrote

> This is to inform you that as of 7 a.m. on Tuesday, August 24, 1999, Associates in Emergency Medicine will no longer be providing Emergency Physician Services at East Ridge Hospital.

The Hospital responded by citing the Agreement and informing the Plaintiff that his medical staff privileges were terminated in accordance with Section 6 of Addendum 1 of the Agreement.

The Plaintiff argues that the Agreement expired June 30, 1999 and thus his legal relationship with the Hospital was governed by its bylaws which required notice and hearing by virtue of the April 1999 amendment. The Defendant argues that although the formal Agreement expired by its own terms on June 30, 1999, both parties continued to perform as though the Agreement was still in effect, thereby giving rise to the presumption that they are performing under a new contract with the same terms as the old. This is the rule in Tennessee. *Delzell v. Pope*, 294 S.W.2d 690 (Tenn. 1956); *Ward v. Berry and Associates*, 614 S.W.2d 372 (Tenn. Ct. App. 1981); *McCall v. Oldenburg* 382 S.W.2d 537 (Tenn. 1964). We note that the Plaintiff cannot, as is sometimes said, have it both ways; if he had been instructed to vacate the premises when his Agreement expired, he would have no justiciable reason whatever to maintain this action. But with the consent of the Hospital he continued to work, thereby implicating the rule announced in *Delzell.* The Agreement remained in effect and was not invalidated by the April 1999 Amendment to the Bylaws. It follow that the Hospital acted within its contractual rights when it terminated the Plaintiff's staff privileges. The judgment is affirmed at the costs of the Appellant.

_____
WILLIAM H. INMAN, SENIOR JUDGE

-13-